**MORGAN, LEWIS & BOCKIUS LLP**
*(Pennsylvania Limited Liability Partnership)*
Sarah E. Bouchard (NJ ID # 02807-1995)
David C. Dziengowski (NJ ID # 03014-2008)
Emily C. Byrne (*pro hac vice* forthcoming)
2222 Market Street
Philadelphia, PA 19103
215-963-5000
sarah.bouchard@morganlewis.com
david.dziengowski@morganlewis.com
emily.byrne@morganlewis.com

*Attorneys for Plaintiffs*
*Solar Energy World and Comcast Cable Communications, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SOLAR ENERGY WORLD and COMCAST CABLE COMMUNICATIONS, LLC, | |
| Plaintiffs, | Civil Action No. _____ |
| v. | |
| MICHEAL BLAIR a/k/a MICHAEL BLAIR a/k/a MICHEAL BLAIT, ALESSANDRO RAMOLA, MICHAEL SEVERNS, SHANE MEHIGAN, and PRIME ENERGY PARTNERS, LLC, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY

i

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .............................................................................................1

II.   STATEMENT OF FACTS.............................................................................3

    A.    Solar Energy World Invests in Its Business, Its Workforce, and Its Customers.........................................................................................3

    B.    Blair's Employment with Solar Energy World and Termination Thereof ...................................................................................................4

    C.    The Field Energy Advisors' Employment with Solar Energy World.......................................................................................................7

    D.    The Defendants' Unlawful Conduct ....................................................9

III.  ARGUMENT.................................................................................................12

    A.    Standard for Injunctive Relief............................................................12

    B.    Injunctive Relief Is Necessary to Stop Defendants' Unlawful Conduct and Prevent Immediate and Irreparable Harm to Solar Energy World and Comcast ...............................................................13

        1.    Plaintiffs are likely to succeed on the merits of their claims ........................................................................................13

            a.    Plaintiffs are likely to prevail on their Defend Trade Secrets Act claims ...............................................13

            b.    Plaintiffs are likely to prevail on their Lanham Act claims...............................................................................17

            c.    Plaintiffs are likely to prevail on their breach of contract claims.............................................................18

            d.    Plaintiffs are likely to prevail on their breach of fiduciary duty claim......................................................27

            e.    Plaintiffs are likely to prevail on their tortious interference claims.........................................................29

            f.    Plaintiffs are likely to prevail on their unfair competition claims........................................................32

        2.    An injunction is necessary to prevent immediate and irreparable harm .......................................................................34

**TABLE OF CONTENTS**
(continued)

3. The balancing of equities weighs heavily in favor of Plaintiffs ................................................................................... 35

4. Injunctive relief is in the public interest .................................. 37

C. This Court Should Issue a Temporary Restraining Order to Prevent Immediate Irreparable Harm to Plaintiffs Pending a Hearing on the Motion for a Preliminary Injunction .......................... 38

D. This Court Should Order Expedited Discovery and Preservation ..... 38

IV. CONCLUSION ............................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.T. Hudson & Co. v. Donovan*,
   524 A.2d 412 (N.J. Super. Ct. App. Div. 1987) ................................................24

*AgroLabs, Inc. v. Innovative Molding, Inc.*,
   No. 13-cv-6169, 2014 WL 3535560 (D.N.J. July 16, 2014)..............................19

*Albert's Organics, Inc. v. Holzman*,
   445 F. Supp. 3d 463 (N.D. Cal. 2020).................................................................14

*Allegis Grp., Inc. v. Jordan*,
   No. 12-cv-2535, 2014 WL 2612604 (D. Md. June 10, 2014), *aff'd*,
   951 F.3d 203 (4th Cir. 2020) ......................................................................24, 26

*Am. Greetings Corp. v. Dan-Dee Imps., Inc.*,
   807 F.2d 1136 (3d Cir. 1986) .............................................................................13

*Avaya Inc., RP v. Telecom Labs, Inc.*,
   838 F.3d 354 (3d Cir. 2016) .......................................................................*passim*

*Better Packages, Inc. v. Zheng*,
   No. 5-cv-4477, 2006 WL 1373055 (D.N.J. May 17, 2006) ...............................39

*Bimbo Bakeries USA, Inc. v. Botticella*,
   613 F. 3d 102 (3d Cir. 2010) .............................................................................12

*Bimbo Bakeries USA, Inc. v. Botticella*,
   No. 10-cv-0194, 2010 WL 571774 (E.D. Pa. Feb. 9, 2010), *aff'd*,
   613 F.3d 102 (3d Cir. 2010) ..............................................................................39

*Blue Ridge Risk Partners, LLC v. Willem*,
   724 F. Supp. 3d 398 (D. Md. 2024)....................................................................22

*Chemetall US Inc. v. Laflamme*,
   No. 16-cv-780, 2016 WL 885309 (D.N.J. Mar. 8, 2016)............................24, 26

*ClearOne Advantage*, LLC v. Kersen, 710 F. Supp. 3d, 425, 434 (D.
   Md. 2024)............................................................................................................25

*ClearOne Advantage, LLC v. Kersen*,
  756 F. Supp. 3d 30 (D. Md. 2024)..............................................................*passim*

*Columbia Broad. Sys., Inc. v Melody Recordings, Inc.*,
  341 A.2d 348 (N.J. Super. App. Div. 1975)......................................................33

*EndoSurg Med., Inc. v. EndoMaster Med., Inc.*,
  71 F. Supp. 3d 525 (D. Md. 2014)..............................................................28, 29

*Esquire Deposition Servs., LLC v. Boutot*,
  9-cv-1526, 2009 WL 1812411 (D.N.J. June 22, 2009) ......................................37

*Healthcare Servs. Grp. v. Fay*,
  597 F. App'x 102, 104 (3d Cir. 2015).........................................................36, 37

*HR Staffing Consultants LLC v. Butts*,
  627 F. App'x 168 (3d Cir. 2015) .....................................................22, 27, 35, 37

*Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*,
  389 A.2d 887 (Md. App. Ct. 1978).................................................................28

*IMS Health Info. Sols. USA v. Lempernesse*,
  No. 15-cv-7561, 2016 WL 236214 (D.N.J. Jan. 19, 2016) ................................39

*Ingersoll-Rand Co. v. Ciavatta*,
  542 A.2d 879 (N.J. Sup. Ct. 1988) .................................................................22

*Jevremovic v. Courville*,
  No. 22-cv-4969, 2024 WL 4024144 (D.N.J. Aug. 30, 2024)..............................34

*Lamorte Burns & Co. v. Walters*,
  770 A.2d 1158 (N.J. Sup. Ct. 2001) ...............................................................32

*MarbleLife, Inc. v. Stone Res., Inc.*,
  759 F. Supp. 2d 552 (E.D. Pa. 2010)...............................................................35

*Maryland Metals, Inc. v. Metzner*,
  382 A.2d 564 (1978).....................................................................................28

*McNeilab, Inc. v. Am. Home Prods. Corp.*,
  501 F. Supp. 517 (S.D.N.Y. 1980) .................................................................17

*Menasha Packaging Co., LLC v. Pratt Indus., Inc., et al.*,
  No. 17-cv-00075 (D.N.J. Jan. 5, 2017)................................................................39

*Millward v. Gerstung Int'l Sport Educ., Inc.*,
  302 A.2d 14 (Md. App. Ct. 1973).......................................................................24

*Moreno v. Tringali*,
  No. 14-cv-4002, 2017 WL 2779746 (D.N.J. June 27, 2017) .............................18

*NaturaLawn of Am., Inc. v. W. Grp., LLC*,
  484 F. Supp. 2d 392 (D. Md. 2007)................................................................19, 23

*Nester v. O'Donnell*,
  693 A.2d 1214 (N.J. Super. Ct. App. Div. 1997) ...............................................20

*Orient Turistik Magazacilik San ve Tic Ltd. STI v. Aytek USA, Inc.*,
  No. 22-cv-4864, 2023 WL 3559049 (D.N.J. May 18, 2023) .............................14

*P.C. of Yonkers, Inc. v. Celebrations! The Party And Seasonal
  Superstore, LLC*,
  2007 WL 708978 (D.N.J. Mar. 5, 2007) ............................................................16

*In re Patriot Nat'l Inc.*,
  592 B.R. 560 (Bankr. D. Del. 2018)..............................................................14, 15

*Portillo v. Nat'l Freight, Inc.*,
  323 F. Supp. 3d 646 (D.N.J. 2018).....................................................................18

*Ruhl v. F. A. Bartlett Tree Expert Co.*,
  225 A.2d 288 (Md. App. Ct. 1967).....................................................................24

*Saturn Wireless Consulting, LLC v. Aversa*,
  No. 17-cv-1637 (D.N.J. Mar. 10, 2017) .............................................................39

*Schuhalter v. Salerno*,
  653 A.2d 596 (N.J. Super. Ct. App. Div. 1995) .................................................26

*Solari Indus., Inc., v. Malady*,
  264 A.2d 53 (N.J. 1970) .....................................................................................22

*Sun Dial Corp. v. Rideout*,
  16 N.J. 252 (1954) .............................................................................................16

*Tabs Assocs., Inc. v. Brohawn*,
  475 A.2d 1203 (Md. Ct. Spec. App. 1984)............................................16, 28, 29

*Teva Pharms. USA, Inc. v. Sandhu*,
  291 F. Supp. 3d 659 (E.D. Pa. 2018)...................................................................14

*Trico Equip., Inc. v. Manor*,
  No. 8-cv-5561, 2009 WL 1687391 (D.N.J. June 15, 2009) .........................24, 26

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
  898 F.2d 914 (3d Cir. 1990) ...............................................................................17

*Vibra-Tech Engineers, Inc. v. Kavalek*,
  849 F. Supp. 2d 462 .............................................................................30, 31, 32

*Vorhees v. Tolia*,
  No. 16-cv-8208, 2020 WL 1272193 (D.N.J. Mar. 17, 2020), *aff'd*
  *sub nom. Voorhees v. Tolia*, No. 23-cv-1115, 2023 WL 4636738
  (3d Cir. July 20, 2023)...................................................................................32, 34

*Wright Med. Tech., Inc. v. Somers*,
  37 F. Supp. 2d 673 (D.N.J. 1999).......................................................................27

## Statutes

Defend Trade Secrets Act, 18 U.S.C. §§ 1839 ..................................................13, 15

Lanham Act, 15 U.S.C. § 1125(a) .....................................................................17, 18

## Other Authorities

Fed. R. Civ. P 26(d) ..........................................................................................38, 39

Fed. R. Civ. P 65(a)...........................................................................................12, 38

## I.   INTRODUCTION

Contracts, statutes, and the common law outline the boundaries of competitive activity, setting the "rules of the game" and generally requiring those in the marketplace to abide by basic notions of "fair play."  Michael Blair, Alessandro Ramola, Michael Severns, Shane Mehigan, (collectively, the "Individual Defendants") and Prime Energy Partners LLC ("Prime Energy") disregarded these rules and cast aside any pretense of fair play by brazenly soliciting—and continuing to solicit—Solar Energy World's employees and customers using Solar Energy World's *own* trade secrets and confidential information.  To make matters worse, they have deployed—and continue to deploy—deceptive tactics, causing customer confusion and prompting several customers to contact Solar Energy World to express concern and uncertainty regarding their solar energy projects.

The Individual Defendants owe clear contractual duties not to compete with Solar Energy World, solicit its employees and customers, or use or disclose its confidential information.  Yet that is precisely what they have done.  Blair, acting on behalf of himself and Prime Energy, lifted and leveraged Solar Energy World's confidential commission and pricing information to recruit at least three Solar Energy World employees (Ramola, Severns, and Mehigan) to join his competitive solar energy venture.  The Individual Defendants have also begun soliciting Solar Energy World's customers.  Multiple customers have called Solar Energy World to

voice their concern about this activity and express confusion. For example, during what was purportedly a Solar Energy World call with a Solar Energy World customer, Blair and Ramola provided project proposals for a ***competitor***—a classic "bait and switch." Blair and Mehigan falsely told another Solar Energy World customer that the Company could not complete his project, and then tried to persuade him to allow a competitor to complete the work. Severns purported to be from a "solar overwatch organization" in an effort to solicit another Solar Energy World customer. And Ramola so confused one customer that she called the Company concerned that her project had in fact been transferred to another company against her wishes. The Defendants' conduct not only violates contractual obligations; it also violates federal statutes and common law obligations.

Through this customer outreach, Defendants' wrongdoing has come into sharper focus. Solar Energy World and its parent company Comcast Cable Communications, LLC ("Comcast") have been harmed. While expedited discovery will be necessary to uncover the full scope of the misconduct, the unlawful nature of Defendants' conduct is clear. Immediate injunctive relief is necessary to stop this conduct and prevent further irreparable harm to Plaintiffs' customer relationships and goodwill and protect their trade secrets and other confidential business information.

## II.    STATEMENT OF FACTS

### A.    <u>Solar Energy World Invests in Its Business, Its Workforce, and Its Customers.</u>

Solar Energy World provides solar energy system installation and services in New Jersey and several other states.  Compl. ¶ 34.  It markets its products and services through its sales employees, who conduct market research, generate customer leads, discuss Solar Energy World's products and services with potential customers, and provide service estimates and product pricing.  *Id.* ¶ 36.  Solar Energy World prides itself on its work and guarantees that its product and installation personnel are employees (not subcontractors).  *Id.* ¶ 35.

Solar Energy World works to stay abreast of advances in the rapidly developing area of solar energy and deliver those products and services to customers. *Id.* ¶ 37.  As part of this effort, Solar Energy World compiles confidential customer information—including lists of its current and target customers ("Lead Lists")— based on proprietary market and product research, customer outreach efforts, and sales strategies.  *Id.* ¶ 38.  This information would be highly valuable to a competitor, who could unfairly leverage it for its own sales efforts.  *Id.* ¶¶ 39–40.  Accordingly, Solar Energy World strictly limits access to this information to the sales employee who is assigned to a particular lead.  *Id.* ¶¶ 40–41.

Solar Energy World also works hard to recruit and retain a talented workforce, as its sales employees are crucial to its success.  *Id.* ¶ 42.  To that end, it has

developed a confidential employee commission structure. *Id.* This information is contained in various documents, including a "Commission Calculator," which details the various commission tiers that dictate an employee's potential commissions. *Id.* It also includes sensitive information about the pricing structures that apply in each territory. *Id.* In the hands of a competitor, this information could be used to gain an unfair advantage over Solar Energy World with respect to employee recruitment and retention and customer pricing. *Id.* ¶ 43. Access to this information is strictly limited to the regional area's Vice President of Sales (in this case, Blair). *Id.* ¶¶ 44–45. The Company requires employees to sign employment agreements affirming that they will not use or disclose such confidential information. *Id.* ¶¶ 46–48.

**B.**   **Blair's Employment with Solar Energy World and Termination Thereof.**

Blair joined Solar Energy World in November 2021. In November 2022, the Company promoted Blair to Vice President of Sales for New Jersey, and in January 2025, the Company promoted Blair to Vice President of Sales for New Jersey and Florida. *Id.* ¶¶ 49–50. As Vice President, he was responsible for overseeing sales personnel in both states. *Id.* ¶ 51. Blair also had access to Solar Energy World's confidential and proprietary information, including detailed customer, product, compensation, and pricing information (such as the Commission Calculator). *Id.* ¶ 52.

Blair signed an Employee Agreement with Solar Energy World.  Ex. A[1].  The Employee Agreement included a Confidentiality provision, whereby Blair acknowledged his access to "trade secrets, customers, proprietary data and/or Confidential Information."  *Id.* ¶ 1.  He also acknowledged his fiduciary duty and duty of loyalty to Solar Energy World and his associated obligation not to disclose confidential business information.  *Id.*  He agreed not to disclose such information to any third party (except as required to perform his duties for Solar Energy World) or use it for his personal benefit or the benefit of anyone other than Solar Energy World.  *Id.*

The Employee Agreement also contained a Non-Competition provision.  *Id.* ¶ 4.  Pursuant to that provision, Blair agreed that during his employment with Solar Energy World and for twelve months thereafter, he would not:

    i.    directly or indirectly work for, contract with, or provide strategic advice to a competitor in the geographic area he serviced on behalf of Solar Energy World or a 40-mile radius from the Solar Energy World office at which he was primarily associated (the "Restricted Area") in a capacity similar to that in which he worked for Solar Energy World or in a capacity in which his knowledge of Solar Energy World's confidential information or Solar Energy World's customer goodwill would be of competitive value;

    ii.    directly or indirectly compete with Solar Energy World in the Restricted Area as employee, principal, agent, contractor, or otherwise in the sale or licensing of any products or services are competitive with

---

[1] Unless otherwise noted, "Ex." or "Exhibit" refers to the exhibits to the Declaration of Peggy Hill, filed contemporaneously herewith.

those developed, marketed, or sold by Solar Energy World. *Id.*

The Employee Agreement also included a Non-Solicitation and Non-Interference provision, which limited Blair's ability to solicit Solar Energy World employees. Specifically, it provided that, during Blair's employment with Solar Energy World and for twenty-four months thereafter, he would not:

    i.   Solicit or induce anyone who was a Solar Energy World employee within the 12 months preceding his termination to leave employment or interfere in any way with their employment, hire or participate in the hiring of any such Solar Energy World for another company, or contacting any such Solar Energy World employee for the purpose of doing so; or

    ii.   Act in any way, directly or indirectly, with the purpose or effect of soliciting, diverting or taking away any such Solar Energy World employee. *Id.* ¶¶ 4(c), (d).

The Employee Agreement's Non-Solicitation and Non-Interference provision also limited Blair's ability to solicit Solar Energy World customers. Specifically, it provided that, during Blair's employment with Solar Energy World and for twenty-four months thereafter, he would not:

    i.   directly or indirectly solicit or influence (or contact for purposes of soliciting or influencing), any current or prospective Solar Energy World customer or supplier, to terminate or adversely modify its relationship with Solar Energy World or to do business with a competitor, nor assist any others in such conduct;

    ii.   directly or indirectly interfere with any transaction, agreement or business relationship in which Solar Energy World was involved during his employment and about which he was aware because of his employment; or

    iii.   act in any way, directly or indirectly, with the purpose or effect of

soliciting, diverting or taking away any current or prospective Solar Energy World customer or supplier. *Id.* ¶¶ 4(a), (b), (d).

These restrictive covenants, which Blair acknowledged as reasonable, are designed to protect the Company's customer relationships and goodwill and its trade secrets and other confidential business information. Protecting these interests is particularly important in the highly competitive solar energy industry. *Id.* ¶ 58.

Comcast acquired Solar Energy World on November 1, 2024. *Id.* ¶ 70. Following the acquisition, Solar Energy World became a wholly owned subsidiary of Comcast, and its employees were required to undergo routine background screening—a condition precedent to continued employment. *Id.* ¶¶ 71–73. Blair submitted his background screening information under the name "Mich**ea**l Blair" and represented that he did not have a criminal history. *Id.* ¶ 74. However, Comcast human resources soon learned that Blair had also gone by the name "Mich**ae**l" Blair and Micheal "Blait" and, under those versions of his name, had an extensive criminal history. *Id.* ¶ 75. Blair (1) did not disclose this history before the background screening, (2) specifically stated on the relevant forms that he had no criminal record, and (3) refused to provide documentation relating to his criminal history upon request. *Id.* ¶¶ 76–77. On April 2, 2025, Solar Energy World terminated Blair's employment based on his dishonest conduct during this screening process. *Id.* ¶ 78.

## C.   **The Field Energy Advisors' Employment with Solar Energy World.**

Alessandro Ramola, Michael Severns, and Shane Mehigan (the "Field Energy Advisors") were hired as Field Energy Advisors between May and August 2024. *Id.* ¶¶ 61–63. They reported directly to Blair and sold Solar Energy World's products and services in New Jersey. *Id.* ¶ 64. They had access to Solar Energy World's confidential and proprietary information, including detailed customer, product, and pricing information (including, but not limited to, the Lead Lists). *Id.* ¶ 65.

The Field Energy Advisors also signed Employee Agreements with Solar Energy World.[2] Exs. B, C, and D. Like Blair, they acknowledged that Solar Energy World would provide them with trade secrets and other proprietary and confidential information. *Id.* ¶ 5. They agreed to keep such information confidential and to not exploit it or disclose it to any third party.

Each of their Employee Agreements also contained a Covenant Not to Compete/Not to Solicit. *Id.* ¶ 7(i). Pursuant to that provision, each Field Energy Advisor agreed that during his employment with Solar Energy World and for twelve months thereafter, he would not "directly or indirectly sell, attempt to sell, solicit for sale, or attempt to solicit for sale any services or products for any business that engages in [Solar Energy World's] business." *Id.*

The Field Energy Advisors also agreed that during their employment with

---

[2] Titled "Direct Seller Agreements," we refer to the Field Energy Advisors' agreements as Employee Agreements for the sake of convenience.

Solar Energy World and for twenty-four months thereafter, they would not "directly or indirectly [] solicit or attempt to solicit for [their] benefit or for the benefit of any person or entity other than [Solar Energy World], the business of any Company Client during the eighteen (18) months preceding termination of this Agreement"; "employ, attempt to employ, or solicit for employment by others, any Company employee" within "twelve (12) months preceding termination"; or "induce or attempt to induce any client, consultant, independent contractor, or other third party to sever its relationship with [Solar Energy World]." *Id.*

### D.    **The Defendants' Unlawful Conduct.**

Shortly after Blair's employment was terminated, he began soliciting Solar Energy World employees to join him in a new solar energy venture. On April 16, 2025, a Solar Energy World employee overheard a conversation between Severns and Blair, discussing a version of the Commission Calculator, which was displayed on Severns' computer screen. *Id.* ¶¶ 79–80. The employee reported his observations to Solar Energy World. *Id.* ¶ 80. Severns explained that he and Blair had been discussing an "updated" Commission Calculator, which was based upon the Commission Calculator Blair obtained from Solar Energy World during his employment. *Id.* ¶ 81. Severns admitted that he provided Blair with additional details relating to Solar Energy World's commission structure, which had changed since Blair's termination and to which Blair did not have access post-termination.

*Id*.  Blair incorporated this information into the document and sent an "updated" Commission Calculator to Severns.  *See* Ex. F.

The same day, Blair sent Severns a second email with several attachments, which Blair described as "proof" that two additional Solar Energy World employees—Tom Shaw and Nick Schnell—were planning to join "Prime Energy" and, in the case of Schnell, had been "fully onboarded."  Ex. G.  As Solar Energy World soon discovered, Defendant Prime Energy Partners LLC is a New Jersey entity, created by Blair shortly after his termination, whose corporate purpose is to "engage in the business of solar energy sales, consulting, and management."  Ex. M.[3]  The attachments to Blair's email included two Lead Lists, which identified several current and potential Solar Energy World customers, their personal contact information, and information about their respective Solar Energy World projects. Blair noted that the lists included customers who Blair would "follow up" on and described some of the customers as "open op[portunities]."  Ex. G.  He further noted that he had already spoken to some of these customers.  *Id.*

Other Solar Energy World employees began reporting that Blair and/or Severns had reached out to them to recruit them to work for a competitor (upon information and belief, Prime Energy).  *Id*. ¶¶ 82–83.  At least one employee reported

---

[3] Exhibit M, a publicly-available document, is not an exhibit to the Hill declaration but is filed contemporaneously herewith.

that Severns used information from the Commission Calculator to illustrate that the employee would earn more on a sale for the competitor that he would earn from Solar Energy World on a similar sale. *Id*. ¶ 84. Upon information and belief, Severns did so at Blair's direction. *Id*. Their solicitation efforts were fruitful, and they ultimately recruited Ramola and Mehigan as well. *Id*. ¶ 85.

Blair and the Field Energy Advisors (who were still Solar Energy Employees at the time) promptly began soliciting Solar Energy World customers with Blair's help. By way of example:

- On May 2, 2025, Blair joined Mehigan in a call with a Solar Energy Customer, where they falsely told the customer that Solar Energy World could not complete his solar installation project due to the "pitch" of his roof. Ex. H; Compl. ¶ 86. They then attempted to recruit the Solar Energy World customer to utilize a competitor company instead. *Id.* This interaction made the customer uncomfortable, prompting him to reach out to Solar Energy World for clarity. Ex. H.

- On May 3, 2025, Ramola included Blair in what was supposed to be a Solar Energy World sales meeting with a Solar Energy World customer. Ex. I. During the meeting, Blair and Ramola provided the customer with product and service information that differed from previous information the customer had received from Solar Energy World, thereby confusing the customer. *Id*. The customer was under the impression that Solar Energy World was "splitting off" into an entity with which Ramola and Blair would be affiliated. *Id.*

- On May 5, 2025, Severns called a Solar Energy World customer fraudulently claiming he was part of a "solar overwatch organization" (a non-existent entity) and asking to "evaluate" the customer's Solar Energy World contract to ensure he was getting the "best pricing," a transparent attempt to solicit the customer on behalf of a competitor.

11



Ex. J.

- On May 13, 2025, Solar Energy World received a call from a New Jersey–based customer, who reported that Ramola had attempted to "transfer" her project to another company. Exs. K and L. This customer, an apparent elderly woman, was confused and concerned that her account had been transferred against her wishes. *Id.*

Given this brazen conduct, Plaintiffs have ample reason to believe that the Individual

Defendants have solicited and continue to solicit countless other customers.

## III.   ARGUMENT

### A.   <u>Standard for Injunctive Relief.</u>

The assessment of whether to issue injunctive relief pursuant to Federal Rule

of Civil Procedure 65(a) is guided by four factors: (1) the plaintiff's likelihood of

success on the merits; (2) whether the plaintiff will suffer irreparable harm if the

injunction is denied; (3) whether granting relief to the plaintiff will result in even

greater harm to the defendants; and (4) whether the public interest favors such relief.

*See, e.g.*, *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F. 3d 102, 109 (3d Cir. 2010);

*Am. Greetings Corp. v. Dan-Dee Imps., Inc.*, 807 F.2d 1136, 1140 (3d Cir. 1986) (outlining burden on temporary restraining order).  Here, all four factors weigh strongly in favor of an injunction.

### B.    Injunctive Relief Is Necessary to Stop Defendants' Unlawful Conduct and Prevent Immediate and Irreparable Harm to Solar Energy World and Comcast.

#### 1.    Plaintiffs are likely to succeed on the merits of their claims.

##### a.    *Plaintiffs are likely to prevail on their Defend Trade Secrets Act claims.*

Plaintiffs are likely to prevail on their claims under the Defend Trade Secrets Act ("DTSA").  The DTSA creates a private right of action for the misappropriation of trade secrets, defined as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use" of a trade secret without the consent of the owner. 18 U.S.C. §§ 1839(5)(A)-(B), 1836(b)(1).

A trade secret is any information that the owner has "taken reasonable measures to keep . . .secret" and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" 18 USC § 1839(3)(A)-(B).  Solar Energy World's customer, product, and pricing information (including, but not limited to, the Lead Lists and Commission Calculator) constitute trade secrets under the statute,

given the measures it took to keep such information confidential.  For example, the customers on the Lead List (and their related information) is only provided to the sales employee to whom each customer lead is assigned.  Hill Decl. ¶ 8.  The Commission Calculator is only available to the territory's Vice President of Sales (in the case of New Jersey, Mr. Blair).  *Id.* ¶ 9.  Even Regional Sales Managers do not have access to this document.  *Id.  See, e.g.*, *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018) (allowing DTSA claim to proceed based on the alleged use of information relating to an FDA drug application to which the company restricted access).

And, as courts have recognized, customer lists and compensation and pricing information have immense potential economic value to competitors.  *See, e.g.*, *Orient Turistik Magazacilik San ve Tic Ltd. STI v. Aytek USA, Inc.*, No. 22-cv-4864, 2023 WL 3559049, at *6 (D.N.J. May 18, 2023) (discussing the economic value of customer lists); *In re Patriot Nat'l Inc.*, 592 B.R. 560, 576, 575–76 n.11 (Bankr. D. Del. 2018) (concluding that employee salary information could constitute a trade secret); *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 472 (N.D. Cal. 2020) ("Courts have frequently held that customer-related information qualifies as a trade secret[.]").  The Defendants did, in fact, use this information to solicit Solar Energy World's customers and employees on behalf of a competitor.  Ex. G (Blair explaining that he would "follow up" on customers in the list, who he referred to as

14

"open op[portunities]," and noting the intention to "build a base of customers using [the information in the customer lists]"); Hill Decl. ¶¶ 11–22. *See Patriot Nat'l Inc.*, 592 B.R. at 560, 576, 575-76 n.11 (noting that the defendant's alleged use of the information to compete with plaintiff indicated it had economic value).

The Defendants misappropriated these trade secrets. An individual misappropriates a trade secret when he knows, or has reason to know, that it was acquired by improper means. 18 U.S.C. § 1839(5)(A). "[I]mproper means" includes the breach of a duty to maintain secrecy. An individual also misappropriates a trade secret when he uses or discloses the trade secret without the owner's consent and, knowing, or with reason to know, that knowledge of the trade secret was derived from or through a person who owed a duty to maintain the secrecy of the trade secret or limit its use. 18 U.S.C. § 1839(5)(B).

That is precisely what happened here. Blair (including on behalf of Prime Energy) improperly acquired the Lead List and Commission Calculator. He was well aware of his own duties to maintain the confidentiality of this information. Moreover, he purportedly acquired the Lead List and Commission Calculator from Solar Energy World employees who also owed contractual and common law duties to maintain the secrecy of this information and avoid acting against Solar Energy World's interest by sharing it with a competitor.[4] Ex. F ("I got the updated

---

[4] Severns also told Solar Energy World that *he* provided Blair with the Commission

15

information from Tom [Shaw] and Nick [Schnell] yesterday."); Ex. G ("Attached show customers [Nick Schnell] and Tom [Shaw] sent me to follow up on."); *Tabs Assocs., Inc. v. Brohawn*, 475 A.2d 1203, 1209 (Md. Ct. Spec. App. 1984) (discussing employees' common law duty not to disclose proprietary information); *P.C. of Yonkers, Inc. v. Celebrations! The Party And Seasonal Superstore, LLC*, 2007 WL 708978, at *12 (D.N.J. Mar. 5, 2007) ("The employee's common law duty also precludes him from disclosing trade secrets or confidential information of his employer, even after his employment has ended." (quoting *Sun Dial Corp. v. Rideout*, 16 N.J. 252, 259 (1954))). As a former Solar Energy World employee and Vice President of Sales, Blair knew, or should have known, that this information was strictly protected and not to be distributed outside the Company. He admits as much. Ex. G ("**Please don't indicate where you got this information from[.]**"). The Field Energy Advisors' acquisition of Solar Energy World's customer, product, and pricing information was similarly improper, as they did so in violation of their contractual obligations and with the clear intention of using it to compete with Solar Energy World in further violation of those obligations.

For these reasons, Plaintiffs are likely to prevail on their DTSA claims.

---

Calculator information. Hill Decl. ¶ 14. Severns, a Solar Energy World employee at the time, owed the same contractual and common law duties to Solar Energy World and violated them by sharing this information with Blair for use by a competitor. Ex. C.

### b.    Plaintiffs are likely to prevail on their Lanham Act claims.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a cause of action for any false description or representation of a product.    Section 43(a) encompasses statements made by a defendant about his or another person's products. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 921 (3d Cir. 1990).  A plaintiff asserting claims under the Section 43(a) of the Lanham Act must show (i) a "false or misleading description of fact, or false or misleading representation of fact," which (ii) "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]" 15 U.S.C. § 1125(a). The misrepresentation must also be "material, in that it is likely to influence the purchasing decision." *U.S. Healthcare*, 898 F.2d at 922.

The Defendants have made numerous actionable false or misleading representations to Solar Energy World's customers.   For example, Blair and Mehigan told a Solar Energy World customer that the Company could not complete a project due to the pitch of his roof (which was false).  Ex. H; Hill Decl. ¶ 17.  *See, e.g.*, *McNeilab, Inc. v. Am. Home Prods. Corp.*, 501 F. Supp. 517, 521 (S.D.N.Y. 1980) (granting injunctive relief against defendant who falsely represented that its products were superior to plaintiff's in violation of the Lanham Act).  Ramola and

Blair led another customer to believe that Solar Energy World was "splitting off" into a new company (it was not).  Ex. I.  Ramola convinced another Solar Energy World customer that her account had been transferred to another company (it had not).  Exs. K and L.  And Severns held himself out as part of a "solar overwatch organization" (which does not exist) in an effort to persuade another customer to break away from Solar Energy World.  Ex. J.  These statements are not just likely to create confusion—they **did** create confusion.  So much so that customers reached out to Solar Energy World on recorded lines to seek clarity and express concern for their projects.  Their misrepresentations are material, leading at least some customers to terminate their Solar Energy World projects.  Hill Decl. ¶¶ 21–22.  Thus, there is a reasonable likelihood that Plaintiffs will prevail on their Lanham Act claim.

### c. *Plaintiffs are likely to prevail on their breach of contract claims.*

To prevail on their breach of contract claims against the Individual Defendants, Plaintiffs must show that each defendant owed a contractual obligation and breached that obligation. *ClearOne Advantage, LLC v. Kersen*, 756 F. Supp. 3d 30, 40 (D. Md. 2024); *Moreno v. Tringali*, No. 14-cv-4002, 2017 WL 2779746, at *4 (D.N.J. June 27, 2017).[5]  They can easily make such a showing.

---

[5] Blair's Employee Agreement states that it is governed by Maryland law.  Ex. A ¶ 13.  This Court generally upholds choice of law provisions in contracts unless doing so would violate public policy.  *See Portillo v. Nat'l Freight, Inc.*, 323 F. Supp. 3d 646, 651 (D.N.J. 2018).  Because the Field Energy Advisors worked in New Jersey,

The plain, unambiguous language of all the Employee Agreements makes clear that the Individual Defendants owed several contractual obligations to Solar Energy World.  With respect to Blair:

- For one year following termination of his employment, Blair agreed not to directly or indirectly compete with Solar Energy World in the same area where he worked for Solar Energy World by working for a competitor in a capacity similar to his role at Solar Energy World or by otherwise competing in the sale and licensing of the same products and services sold by Solar Energy World, Ex. A ¶ 4;

- Blair agreed not to directly or indirectly solicit certain Solar Energy World employees, customers, or suppliers for two years following termination of his employment, *id.* at 5; and

- Blair agreed to keep confidential all trade secrets, customers, proprietary data and/or other confidential information acquired from Solar Energy World, to not use this information for his personal benefit or the benefit of any third party, and to not disclose this information to any third party, *id.* at 1.

*See NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 401 (D. Md.

---

New Jersey law—which is in accord with Maryland, in any event—governs the interpretation of his Employee Contract.  *See AgroLabs, Inc. v. Innovative Molding, Inc.*, No. 13-cv-6169, 2014 WL 3535560, at *2 (D.N.J. July 16, 2014) (finding "no conflict" between New Jersey and Maryland law for breach of contract).

2007) (the terms of a contract are interpreted using their plain and ordinary meaning).

With respect to the Field Energy Advisors, they similarly agreed that:

- During their employment and for one year thereafter, they would not directly or indirectly sell, attempt to sell, solicit for sale, or attempt to solicit for sale any products or services for a competitive business, Exs. B, C, and D ¶ 7;

- They would not directly or indirectly solicit or attempt to solicit the business of certain Solar Energy World employees or customers on behalf of a third party during their employment and for two years thereafter, *id.*; and

- During and after their employment, they would not disclose or exploit Solar Energy World's confidential information, *id.* ¶ 5.

*See Nester v. O'Donnell*, , 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997) ("[T]he terms of the contract must be given their 'plain and ordinary meaning.'").

The Individual Defendants violated their contractual obligations by competing with Solar Energy World, soliciting its customers and employees, and leveraging its confidential information to do so. Indeed, Blair created an entirely new business entity, Prime Energy, for this express purpose. Ex. M. He successfully solicited the Field Energy Advisors to sell competitive solar energy products in

violation of his and their own obligations to Solar Energy World.  Hill Decl. ¶¶ 3, 16–22.    And  he  leveraged  Solar  Energy  World's  confidential  proprietary information, including the Commission Calculator, to do so.  *Id.*  Aided by Solar Energy World's confidential information, including its Lead Lists, the Individual Defendants are soliciting Solar Energy World customers, often using deceptive tactics, causing customer confusion and causing customers to cancel their projects with Solar Energy World.  Exs. H, I, J, K, and L; Hill Decl. ¶¶ 11–22.

Their  conduct  is  nothing  short  of  shocking.   ***While Ramola was a Solar Energy World employee***, he included Blair (by then a former employee) in what was supposed to be a Solar Energy World call with a Solar Energy World customer.  In reality, they mined the customer for information and, after the call, sent information regarding competitive options for the project.  Ex. I.  Another customer called the Company, confused and distressed, reporting that Ramola tried to persuade her to move her business to a competitor.  Exs. K and L.  Blair and Mehigan (who, at the time, was a ***Solar Energy World employee***) told another customer (falsely) that Solar Energy World was unable to complete his project and tried to persuade him to use a competitor.  Ex. H.  And Severns (at the time, a ***Solar Energy World employee***) reached out to a customer purporting to be from a "solar overwatch organization" in an effort to persuade the customer to leave Solar Energy World.  Ex. J.  It is clear that—both during and after their employment—the Individual Defendants violated

21

their restrictive covenants and continue to do so.  This brazen misconduct must be stopped.

To prevail on a breach of contract claim that is premised on the breach of a restrictive covenant, a plaintiff must also show that it has a legally protected interest, the covenant is no wider in scope and duration than is reasonably necessary to protect the employer's interest, the covenant does not impose undue hardship on the employee, and the covenant does not violate public policy.  *ClearOne Advantage*, 756 F. Supp. 3d at 40; *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 171 (3d Cir. 2015) (quoting *Solari Indus., Inc., v. Malady*, 264 A.2d 53, 56 (N.J. 1970)). Plaintiffs can easily do so here.

First, the restrictive covenants in the Employee Agreements are designed to protect Solar Energy World's customer relationships and goodwill, along with its trade secrets and other confidential business information.  Courts have long recognized these as legally protectable interests. *See Blue Ridge Risk Partners, LLC v. Willem*, 724 F. Supp. 3d 398, 404 (D. Md. 2024) (employer had legally protected interest in "ensuring that departing employees do not take advantage of the goodwill that they established for the employer with the employer's customers"); *ClearOne Advantage*, 756 F. Supp. 3d at 41 ("ClearOne has legally protected interests in maintaining the confidentiality of client lead lists and preventing employees from soliciting former colleagues with whom they worked[.]"); *Ingersoll-Rand Co. v.*

22

*Ciavatta*, 542 A.2d 879, 888 (N.J. Sup. Ct. 1988) (recognizing employers' "legitimate … interest in protecting trade secrets, confidential information, and customer relations").

Second, the restrictive covenants in the Employee Agreements are reasonable in scope and duration.  The non-compete provisions remain in effect for only one year post-employment.   Blair is precluded only from competing in the same geographic area where he worked for Solar Energy World.  Ex. A ¶ 4.  And the Field Energy Advisors are prohibited only from selling services or products for a company that engages in the same business as Solar Energy World.  Ex. B, C, and D ¶ 7.

The non-solicit provisions are also narrowly tailored, as they are limited to two years and apply only to a certain subset of customers and employees.[6]  Courts have routinely upheld similar (and even broader) restrictive covenants. *See, e.g.*, *NaturaLawn*, 484 F. Supp. 2d at 400 (D. Md. 2007) (upholding two-year non-compete provision that prohibited defendant from competing in law care services in

---

[6] Blair's Employee Agreement prohibits Blair from soliciting customers who purchased products or services from Solar Energy World within the last *twelve months* of his employment and with whom *he* had business contact or to whom *he* provided services, customers who *he* solicited or pursued within the last *twelve months* of his employment, and Solar Energy World's employees or independent contractors who were with the Company within the last *twelve months* of Blair's employment.  Ex. A ¶ 5.  The Fiend Energy Advisors' Employee Agreements prohibit them from soliciting customers who purchased products from Solar Energy World (or were in discussions to purchase such products) during the last *18 months* of their employment and individuals who were Solar Energy World employees within the last *twelve months* of their employment.  Exs. B, C, and D ¶ 7.

the geography covered by his agreements with plaintiff); *Ruhl v. F. A. Bartlett Tree Expert Co.*, 225 A.2d 288, 292 (Md. App. Ct. 1967) (upholding two-year restrictive covenant that prohibited defendant from engaging in the tree care business in the counties where he worked for plaintiff); *Millward v. Gerstung Int'l Sport Educ., Inc.*, 302 A.2d 14, 17 (Md. App. Ct. 1973) (upholding two-year restrictive covenant prohibiting defendant from engaging in the same or similar business as the plaintiff sports education school in the City of Baltimore and surrounding counties and non-solicit provision with no temporal limit); *Allegis Grp., Inc. v. Jordan*, No. 12-cv-2535, 2014 WL 2612604, at *8 (D. Md. June 10, 2014) (upholding two-year non-compete and non-solicit provisions), *aff'd*, 951 F.3d 203 (4th Cir. 2020).  *See also Trico Equip., Inc. v. Manor*, No. 8-cv-5561, 2009 WL 1687391, at *7-9 (D.N.J. June 15, 2009) (holding "a two year period after employment [is] a period that New Jersey courts have found to be reasonable" and granting preliminary injunction enforcing restrictive covenant non-solicitation for any customers, supplier, and/or employee for two years, non-disclosure of confidential information for two years, and non-competition within former sales territory for one year); *Chemetall US Inc. v. Laflamme*, No. 16-cv-780, 2016 WL 885309, at *12 (D.N.J. Mar. 8, 2016) (granting preliminary injunction and holding "restriction on soliciting or assisting others to solicit the [plaintiff's] customers [defendant] served in the last two years is reasonable is scope"); *A.T. Hudson & Co. v. Donovan*, 524 A.2d 412, 414-15 (N.J.

24

Super. Ct. App. Div. 1987) (affirming judgment where defendant "breached the restrictive covenant by soliciting plaintiff's customers within the prohibited two year period").

For similar reasons, the restrictive covenants in the Employee Agreements do not impose undue hardship. Blair is still free to sell competitive products and services *outside* of the geographic area where he worked for Solar Energy World, and he is free to do so, regardless of geographic area, after just one year. He may solicit customers with whom he had no business contact and/or who did not purchase Solar Energy World products or services in the last twelve months of his employment. He is also free to leverage the sales and managerial experience gained at Solar Energy World to work for an entity that does not compete with Solar Energy World or to otherwise apply his talent at sales in a new industry.

Likewise, the Field Energy Advisors are free to sell non-competitive products and services anywhere they wish, and they are free to sell competitive products after just one year. And they may solicit customers and employees who were not affiliated with Solar Energy World in the last eighteen or twelve months of their employment, respectively.

In short, the restrictive covenants do not foreclose the Individual Defendants' opportunities for gainful employment, including in the same industry. *See ClearOne Advantage*, LLC v. Kersen, 710 F. Supp. 3d, 425, 434 (D. Md. 2024) (upholding

restrictive covenants that did not present a "total bar" to the defendant pursuing similar work in the industry and only applied to customer with whom the defendant had business contacts); *Allegis*, 2014 WL 2612604, at \*7 ("A non-competition provision does not impose undue hardship when an employee is permitted to undertake similar work."), *aff'd*, 951 F.3d 203 (4th Cir. 2020); *Schuhalter v. Salerno*, 653 A.2d 596, 601 (N.J. Super. Ct. App. Div. 1995) (restrictive covenant of "only two years [is] a modest imposition" when it "did not require him to forego or limit his professional activities"); *Trico Equip., Inc.*, 2009 WL 1687391, at \*9, \*2 (granting preliminary injunction for non-compete only in "geographic areas which formerly constituted [defendant's] sales territory while he was employed by [plaintiff]," as defendant agreed he would "still be able to earn a livelihood without violating this agreement").

Finally, the restrictive covenants do not violate public policy. To the contrary, "the public interest *favors* the protection of trade secrets . . . the prevention of unfair business practices … [and] the enforcement of reasonable restrictive covenants, as they 'can play an important role in the growth of a business that depends upon the development of good will through effective customer service.'" *ClearOne Advantage*, 756 F. Supp. 3d at 47 (D. Md. 2024). *See also Chemetall US Inc.*, 2016 WL 885309, at \*17 (granting injunction and finding public interest favored "Judicial enforcement of non-competition provisions of employment contracts serves the

public interest by promoting stability and certainty in business and employment relationships" (quoting *Wright Med. Tech., Inc. v. Somers*, 37 F. Supp. 2d 673, 684 (D.N.J. 1999))); *HR Staffing Consultants*, 627 F. App'x at 175 (affirming preliminary injunction because "the public at large can be expected to gain" from enforcement, which allow companies to "continue performing their services for both employees and employers").

Because the Individual Defendants clearly breached their contractual obligations to Solar Energy World, and because those contractual obligations are reasonable and enforceable, Plaintiffs are reasonably likely to prevail on their breach of contract claims.

### d.    *Plaintiffs are likely to prevail on their breach of fiduciary duty claim.*

As former Vice President of Sales, Blair's Employee Agreement recognizes and affirms his fiduciary duty to Solar Energy World.  Ex. A ¶ 1 ("Employee acknowledges Employee's fiduciary duty and duty of loyalty to the Company, and the obligations arising from them not to disclose business information provided or acquired on a confidential basis … [A]fter any termination of Employee's employment, Employee agrees to protect and hold in a fiduciary capacity for the benefit of the Company all Confidential Information.").  A fiduciary relationship "carries with it the requirement of utmost good faith and loyalty and the obligation of (the fiduciary) to make full disclosure of all known information that is significant

and material to the affairs . . . of (the fiduciary relationship)[.]"  *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 389 A.2d 887, 903 (Md. App. Ct. 1978).[7]

A fiduciary breaches his duty where, as here, he uses the principal's confidential information to compete with the employer, including after the end of the employment relationship.  *See Tabs*, 475 A.2d at 1209 ("Maryland courts have recognized the duty of a former employee not to disclose proprietary information . . . under a common law fiduciary duty."); *EndoSurg*, 71 F. Supp. 3d at 556 ("[An] employee may solicit his former employer's employees and customers without breaching the duty of loyalty unless he does so through 'misuse of his former employer's trade secrets or confidential information.'" (quoting *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (1978))).

As explained, *supra*, Blair is not only acting against Solar Energy World's interests by directly competing with it and soliciting its employees and customers, but he is also using its confidential information to do so.  *See* Ex. G; Hill Decl. ¶¶ 11–16.  His disloyalty is compounded by his deception, as he lures customer in under the pretense of being a Solar Energy World employee and then provides false information regarding Solar Energy World's products and services.  Exs. H and I;

---

[7] Under Maryland law, every contract of employment also contains an "implied duty that an employee act solely for the benefit of his employer in all matters within the scope of employment, avoiding all conflicts between his duty to the employer and his own self-interest."  *EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 556 (D. Md. 2014).

Hill Decl. ¶¶ 17–22. This is a quintessential breach of fiduciary duty. *See, e.g.*, *Tabs*, 475 A.2d at 1212 (defendant violated her fiduciary duty to her former employer where she was engaged in and a partial owner of a business that directly competed with the former employer and did so utilizing the former employer's trade secrets); *EndoSurg*, 71 F. Supp. 3d 525, 556 (D. Md. 2014) (employer stated breach of fiduciary duty claim against former employee when it alleged that he misappropriated trade secrets and interfered with the plaintiff's business relationships).

### e. Plaintiffs are likely to prevail on their tortious interference claims.

To prevail on a tortious interference claim under New Jersey law, a plaintiff must show: (1) a reasonable expectation of economic advantage (either existing or prospective); (2) that it was lost as a direct result of the defendant's malicious interference; and (3) that it suffered losses thereby. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016).

*First*, the Defendants tortiously interfered with Solar Energy World's existing and prospective customer relationships. Blair, on behalf of Prime Energy, has joined ***Solar Energy World employees'*** calls ***with Solar Energy World customers***—that is, customers whose Solar Energy World projects were already in process—to persuade them to work with a competitor instead. Exs. H and I; Hill Decl. ¶¶ 17–18. The Field Energy Advisors have also tried to persuade Solar Energy World customers to

move their business to a competitor. Exs. H, I, K, and L; Hill Decl. ¶¶ 17–20. Their efforts have been successful, as numerous customers associated with the Individual Defendants have cancelled their contracts. Hill Decl. ¶¶ 21–22. Solar Energy World had a more than reasonable expectation of retaining these customers' business, as they had already signed contractual commitments to purchase Solar Energy World products or services. Hill Decl. ¶ 22. *See Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 492 (plaintiff had reasonable expectation in clients' business where it had already "built strong relationships with its clients"). The fact that the Defendants were able to solicit these customers only confirms Solar Energy World's reasonable expectation in doing so. *See id.* ("The fact that [the defendant] was able to solicit [customers] on behalf of [his new company] is direct evidence of [the plaintiff's] reasonable expectation of doing the same.").

The second element—malicious interference—requires only "the intentional doing of a wrongful act without justification or excuse[,]" i.e., failing to play "by 'the rules of the game.'" *Avaya*, 838 F.3d at 383. There can be no dispute that the Defendants acted maliciously. Blair established Prime Energy for the sole purpose of selling competitive solar products. Ex. M. Defendants leveraged Solar Energy World's wrongfully obtained confidential information on behalf of a competitor. *See Avaya*, 838 F.3d at 386 (noting that the defendants wrongfully accessed and used the plaintiff's confidential information to establish a competitive business). And

they have actively and maliciously attempted to deceive and confuse Solar Energy World's customers to further their and a competitor's own financial interests. Put simply, the Defendants have violated nearly all the "rules of the game."

Loss and causation require "proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Id.* Absent the action of Blair and Prime Energy, it is more likely than not that the prospective customers at issue would have become Solar Energy World customers, as they had already begun working with Solar Energy World and contractually committed to purchasing Solar Energy World products and services. *See* Hill Decl. ¶ 22. Again, the Individual Defendants' successful recruitment of these customers underscores the loss causation element. *See Vibra-Tech*, 849 F. Supp. 2d at 492 ("Since it was part of [the defendant's] job to solicit new clients for [the plaintiff] and since he instead solicited those clients for [a competitive company], it is reasonable to conclude that, but for [the defendant's] wrongful actions in soliciting clients for his competing business, these potential clients would have been [the plaintiff's] clients.").

**Second**, Blair—and Prime Energy, through Blair as its sole founding partner—also tortiously interfered with Solar Energy World's contractual relationships with several of its sales representatives, all of whom had contractual obligations not to compete with Solar Energy World, solicit its customers or

employees, or use or disclose its confidential information.  There is no reason to believe that, absent interference, any of these employees would have left Solar Energy World.  Blair understood that each of the sales representatives in his territory owed contractual duties to Solar Energy World, but he nonetheless persuaded several employees, including the Field Energy Advisors, to breach those obligations, thereby tortiously interfering with Solar Energy World's employment relationships. *See Vibra-Tech*, 849 F. Supp. 2d at 493 (defendant tortiously interfered with plaintiff's employment relationship with another employee when they induced him to work for a competitor in breach of his contractual obligations); *Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1171 (N.J. Sup. Ct. 2001) (defendant committed tortious interference by persuading plaintiff's employees to work for a competitor).

### f.    Plaintiffs are likely to prevail on their unfair competition claims.

A plaintiff asserting a common law claim for unfair competition must allege two essential elements: (1) "the 'misappropriation of one's property by another. . . which has some sort of commercial or pecuniary value'"; and (2) "bad faith or malicious conduct." *Vorhees v. Tolia*, No. 16-cv-8208, 2020 WL 1272193, at \*11 (D.N.J. Mar. 17, 2020), *aff'd sub nom. Voorhees v. Tolia*, No. 23-cv-1115, 2023 WL 4636738 (3d Cir. July 20, 2023).  The purpose of New Jersey's unfair competition law is to "promote higher ethical standards in the business world." *Avaya*, 838 F.3d at 386 (3d Cir. 2016).  At its "essence" the tort is intended to ensure "fair play" in

32

business dealings. *Columbia Broad. Sys., Inc. v Melody Recordings, Inc.*, 341 A.2d 348, 352, 376 (N.J. Super. App. Div. 1975).

The Defendants misappropriated Solar Energy World's confidential information (including the Lead Lists and Commission Calculator) and leveraged that information to persuade several Solar Energy World employees to work on behalf of a competitor. Hill Decl. ¶¶ 11–16. With the aid of Solar Energy World's confidential information and its own employees, they then usurped Solar Energy World's customer relationships, using deceptive tactics and causing customer confusion. Hill Decl. ¶¶ 17–22.

This mischief includes Blair and Ramola holding a call with a Solar Energy World customer, then providing the customer information about a competitor company. Ex. I. Ramola so confused one Solar Energy World customer that she called the Company concerned that her project had been transferred to another company against her wishes. Exs. K and L. Blair and Mehigan falsely told a customer that Solar Energy World could no longer complete his project and then attempted to persuade him to work with a competitor instead. Ex. H. And Severns masqueraded as a representative of a "solar overwatch" company in his solicitation efforts. Ex. J; Hill Decl. ¶ 19.

This conduct is far removed from "high[] ethical standards" or any notion of "fair play." To the contrary, it typifies unfair competition, a claim upon which Solar

33

Energy World will prevail. *See Jevremovic v. Courville*, No. 22-cv-4969, 2024 WL 4024144, at *10 n.12, *11 (D.N.J. Aug. 30, 2024) (noting that unfair competition includes using "dishonest means" that create "confusion in the trade, and enable the seller to pass off upon the unwary his goods as those of another, and thereby deceive the purchaser"); *Avaya*, 838 F.3d at 388 (plaintiff presented sufficient evidence from which a jury could find unfair competition where defendant gained access to plaintiff's proprietary information, including information gained from their own relationship with plaintiff and from plaintiff's former employees); *Vorhees*, 2020 WL 1272193, at *12 (plaintiff adequately stated claim for unfair competition based on allegations that, after the end of their working relationship with the plaintiff, the defendants continued to use the plaintiff's business information to the detriment of the plaintiff).

## 2. An injunction is necessary to prevent immediate and irreparable harm.

If the Defendants are not enjoined, Plaintiffs face immediate and irreparable harm. This harm cannot be easily quantified or measured for the purpose of calculating ex-post facto monetary damages. Courts have universally agreed that the loss of goodwill and confidential proprietary information constitutes irreparable harm, as it is axiomatic that once a customer relationship is lost or such confidential information is disclosed, they are nearly impossible to recover. *See ClearOne Advantage*, 756 F. Supp. 3d at 47 (loss of goodwill and trade secrets, including

34

customer lead lists, constituted irreparable harm); *HR Staffing Consultants*, 627 F. App'x at 174 (threat to the plaintiff's business and the risk of disclosure of confidential information absent an injunction presented a likelihood of irreparable harm). The Employee Agreements recognize this, evidencing that Solar Energy World will suffer irreparable harm absent immediate relief. *See* Ex. A ¶ 8 ("in the event of a violation or threatened violation of any provision of this Agreement, the Company will sustain irreparable harm"); Exs. B, C, and D ¶¶ 5, 7 ("the disclosure or alteration of Confidential Information may give rise to irreparable harm to Company" and "an award of damages alone for breach of these covenants would be inadequate protection for Company, as the injury would be irreparable").

### 3. The balancing of equities weighs heavily in favor of Plaintiffs.

The irreparable harm that will inevitably befall Plaintiffs if the Court denies their request for injunctive relief far outweighs any harm that will occur if the relief is granted. This harm—which amounts to loss of customer goodwill and the release of confidential customer and commission information—is described in detail above. In contrast, Defendants will suffer no harm if the injunction is entered—they will merely be required to abide by the restrictive covenants they freely agreed upon by executing the Employee Agreement, along with their other statutory and common law duties owed to Solar Energy World.[8] *See MarbleLife, Inc. v. Stone Res., Inc.*,

---

[8] These are duties of which Plaintiffs reminded the Individual Defendants, time and

759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) (granting preliminary injunction where the defendant would "not be irreparably harmed by a preliminary injunction as the injunction will only compel Defendant to comply with its rightful contractual obligations" and noting that the harm the defendant argued it would suffer was "at least partially self-inflicted").

Blair will remain free to work for a competitor or sell competitive products—including on behalf of Prime Energy—as long as he does not do so in the same area where he worked for Solar Energy or solicit Solar Energy World's customers or prospective customers. And he is free to compete with Solar Energy World after a period of only one year. He and Prime Energy can even recruit others to help him do so, with the exception of Solar Energy World's workforce. Similarly, the Field Energy Advisors are free to sell non-competitive products in any geographic area and to sell any products after just one year, as long as they do not solicit certain employees or customers for a two-year period. *See Healthcare Servs. Grp. v. Fay*, 597 F. App'x 102, 104 (3d Cir. 2015) (noting that the balance of hardships favored granting a preliminary injunction where the defendants could still work for companies that did not compete with the plaintiff or for competitors outside the restricted area). In any event, to the extent there is any harm to Blair or the Field Energy Advisors, because they "willfully breach[ed] a valid restrictive covenant, the

_____

again, following their termination of employment.

harm to [them] is a predictable consequence of [their] willful breach and … is not the type of harm from which [courts] seek to protect[.]" *HR Staffing Consultants*, 627 F. App'x at 174.

### 4. Injunctive relief is in the public interest.

Finally, the public interest is served by an injunction. Courts agree that the public interest favors the enforcement of reasonable restrictive covenants, the protection of trade secrets, and the prevention of unfair business practices. *See, e.g.*, *Healthcare Servs.*, 597 F. App'x at 104 ("[T]he public interest certainly favors enforcing an agreement into which [the defendants] entered freely and the continued violation of which will cause [the plaintiff] an unfair loss of business."); *ClearOne Advantage*, 756 F. Supp. 3d at 47 ("the public interest favors the protection of trade secrets, and the prevention of unfair business practices . . . The public interest also favors the enforcement of reasonable restrictive covenants, as they 'can play an important role in the growth of a business that depends upon the development of good will through effective customer service.'"); *Esquire Deposition Servs., LLC v. Boutot*, 9-cv-1526, 2009 WL 1812411, at *9 (D.N.J. June 22, 2009) ("A preliminary injunction will serve to enforce valid constraints and will protect the confidentiality of Plaintiff's proprietary information and trade secrets[.]"). The failure to issue an injunction would not only discourage companies from investing significant resources into cultivating customer relationships and goodwill; it would also signal

that employees may eschew their contractual obligations with impunity. An injunction is necessary and appropriate to prevent harm to Plaintiffs, and to prevent harm to similar businesses and their relationships in the future.

**C.    This Court Should Issue a Temporary Restraining Order to Prevent Immediate Irreparable Harm to Plaintiffs Pending a Hearing on the Motion for a Preliminary Injunction.**

This Court should issue a temporary restraining order to protect Plaintiffs' rights and prevent irreparable harm. Because Defendants are directly and indirectly competing with Solar Energy World in the territory in which the Individual Defendants previously worked, including by actively soliciting current and prospective Solar Energy World customers, the requested relief should not be delayed or additional notice to Defendants required. *See* Fed. R. Civ. P. 65(b). Moreover, the relief afforded by the temporary restraining order would not prejudice any legitimate interest of Defendants for the reasons discussed above and because the relief will extend only through a brief period of expedited discovery followed by a hearing on Solar Energy World's request for preliminary injunction.

**D.    This Court Should Order Expedited Discovery and Preservation.**

Expedited discovery is necessary to ensure the preservation of crucial evidence and allow Plaintiffs to determine the scope of Defendants' trade secret misappropriation. Rule 26(d) of the Federal Rules of Civil Procedure permits this Court to order expedited discovery, which is appropriate in connection with motions

38

seeking to prevent irreparable injury.  *See, e.g.*, *Bimbo Bakeries USA, Inc. v. Botticella*, No. 10-cv-0194, 2010 WL 571774, at \*1 (E.D. Pa. Feb. 9, 2010) (expedited discovery in trade secret case), *aff'd*, 613 F.3d 102 (3d Cir. 2010); *IMS Health Info. Sols. USA v. Lempernesse*, No. 15-cv-7561, 2016 WL 236214, at \*1 (D.N.J. Jan. 19, 2016) (ordering expedited discovery including the "return [of] all tangible trade secrets and other proprietary information in his possession to Plaintiff"); Notice of Request by Pro Hac Vice, *Menasha Packaging Co., LLC v. Pratt Indus., Inc., et al.*, No. 17-cv-00075  (D.N.J. Jan. 5, 2017), ECF No. 34.; Order To Show Cause For Preliminary Injunction And Temporary Restraining Order, *Saturn Wireless Consulting, LLC v. Aversa*, No. 17-cv-1637 (D.N.J. Mar. 10, 2017), ECF No. 5.; Advisory Committee Notes to Fed. R. Civ. P. 26(d) ("Discovery can begin earlier … in some cases, such as those involving requests for a preliminary injunction").

Requests for expedited discovery in connection with a pending preliminary injunction hearing are "governed by the reasonableness standard[,]" which considers the "breadth of the discovery requests." *Better Packages, Inc. v. Zheng*, No. 5-cv-4477, 2006 WL 1373055, at \*3-4 (D.N.J. May 17, 2006).

Expedited discovery is reasonable here because Plaintiffs have a pressing need for the information.  Plaintiffs have already uncovered evidence of unfair competition, and they will continue to suffer irreparable harm from further mischief

39

of Defendants. Plaintiffs' requests, which focus largely on the Defendants' communications relating to their alleged (and unfair) competition and solicitation of Solar Energy World customers and employees, are narrowly tailored to their claims for injunctive relief. *See* Exs. N-W. Finally, expedited discovery will aid this Court in its consideration of Plaintiffs' Motion, which is premised on Defendants' unfair competition, misappropriation, and market confusion.

## IV.   CONCLUSION

Plaintiffs respectfully requests that this Court issue a Temporary Restraining Order in the form filed herewith and, after notice and a hearing, a Preliminary Injunction in the form filed herewith. Plaintiffs are prepared to post a reasonable and appropriate bond if the Court so orders.

Dated: May 28, 2025                   Respectfully submitted,

*/s/ David D. Dziengowski*
David C. Dziengowski
Sarah E. Bouchard
Emily C. Byrne (*pro hac vice* forthcoming)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA  19103
215-963-5000
sarah.bouchard@morganlewis.com
david.dziengowski@morganlewis.com
emily.byrne@morganlewis.com

*Attorneys for Plaintiffs*
*Solar Energy World and Comcast Cable*
*Communications, LLC*